## No. 11,864.

### EMMA STEPPE VS. CHARLES ALTER AND JAMES O'ROURKE.

48  363
48 1437
48  363
50 1320

Every one is bound to keep his buildings in repair, so that neither their fall nor that of any part of the materials composing them may injure the neighbors or passengers under penalty of all losses and damages which may result from the neglect of the owner in that respect. The owner of the building can not free himself from this primary obligation by leaving to an insurance company, which, carrying a policy on the building had elected, after a fire, to make repairs upon it, to determine the necessity of and the extent of repairs. He can not, as between himself and the public, shift responsibility from himself to the insurance company. The insurance contract may fix and determine the rights and obligations of the parties thereto, but it is not a measure for the rights of the public, nor a criterion by which to test the liability of the owner to it.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

*Lloyd Posey, Horace E. Upton* and *Joseph N. Wolfson* for Plaintiff, Appellee.

*Semmes & Legendre, Branch K. Miller* and *H. H. Price* for Alter, Defendant, Appellant.

Argued and submitted December 6, 1895.
Opinion handed down December 16, 1895.
Rehearing refused February 10, 1896.

Plaintiff, while at work in the employ of the Gulf Bag Company, doing business at Nos. 82, 84 and 86 South Peters street, was hurled down and buried beneath the ruins or *debris* of a falling wall. By the fall of the wall upon her she was bruised severely—three of her ribs were crushed in and broken; her left leg was sprained, and her right leg badly broken in two places. She was shocked and badly hurt. She was immediately taken to the Charity Hospital, where she remained from about 20th June, 1892, until August 4, 1892. She was removed to the Touro Infirmary, where she remained until the 1st of January, 1893.

The injuries received by her resulted, and were directly occasioned by the falling of the wall above referred to, which was a wall in common separating the building of the defendant, O'Rourke, occupied and leased by the Gulf Bag Company, from the adjoining building No. 80 South Peters street, owned by the defendant. The demand was for twenty-five thousand dollars damages.

The suit against O'Rourke was discontinued before trial. There was judgment for plaintiff for six thousand five hundred dollars, and defendant Alter appeals.

The opinion of the court was delivered by

NICHOLLS, C. J. The facts connected with the falling of the wall which gave rise to the present litigation were brought to our attention in the matter of Knoop vs. Alter and O'Rourke, reported in 47 An. 570. Some testimony not adduced on the Knoop trial was in-

troduced in the present case, but it is not of such a character as to alter our views as to the legal responsibility of the defendant for the consequences of that occurrence. Defendant renews his argu-. ment that the Home Insurance Company having under its policy of insurance elected to repair and rebuild the premises No. 80 South Peters, and having taken control and possession of the property, he had no control or direction of the work, that the property and work being under the exclusive control of the company and its agents, under such circumstances the only parties to whom plaintiff could look for redress, if there were fault and injury, would be those engaged in the work. He cites in support of his position, Camp vs. Wardens, 7 An. 321; Gallagher vs. Southwestern Exposition Association, 28 An. 944; Sweeney vs. Murphy and Murphy, 32 An. 628; Peyton vs. Richards, 11 An. 62; Davie vs. Levy, 39 An. 555.

In the first three of these cases the plaintiffs were "employees" of persons who had contracted with the owner of property for the construction of buildings. The rights and obligations of parties were tested in view of relations of "master and servant" and "fellow servants," and as viewed from the standpoint of privity of contract.

In Camp vs. Wardens, 7 An. 327, Mr. Justice Rost, referring to the effect which the fact of "employment" has in passing upon questions of liability for personal injuries, said: "This did not result from any arbitrary rule; it is deducible from elementary principles of law. There is no contract between the owner of the house and the neighbor or passenger which can at all modify the fundamental rule that every man is bound to use his own property so as to cause no injury to others, and he is accordingly held responsible to them for slight neglect in the use or care of it. The case is different with regard to servants and overseers."

In the case at bar there were no relations springing from employment of the plaintiff, either by Alter or the Home Insurance Company. She is a stranger or third party as to both.

In Peyton vs. Richards, 11 An. 62, plaintiff's slave, while walking along the sidewalk of Camp street, in front of a building which was in process of construction, was killed by the falling of cast iron columns and entablatures which formed the front of said building. The evidence showed that the property *belonged to Dr. Farrell*, and that John McVittie was the undertaker of the building. McVittie

made a special contract with Newton Richards (whom plaintiff had made defendant in the case) to put up the iron front of which McVittie furnished the materials, and Richards made another special contract with one Thompson to do the same work.   Thompson himself performed the work with the assistance of laborers hired and paid by himself.   Just as the work was completed the iron columns and plates.fell to the ground in consequence of not being sufficiently propped with pieces of wood under the horizontal pieces, as was usual and customary.   The court held that Thompson, by whose fault, negligence or unskilfulness the accident happened, was not the servant or overseer of Richards, and that the latter was not liable to the plaintiff.   The suit was not directed against the owner of the building.

In Davis vs. Levy, 39 An. 555, plaintiff attempted to hold Levy, who was engaged in the business of running a coal yard, responsible for personal injuries received from the act of one Harris (with whom he had contracted for taking coal from a barge on the river to his yard), in improperly constructing, in order to perform his work, a run or bridge over the public street.   Defendant was not sued for failure to perform any duty incumbent upon him as owner of the coal yard, but as being substantially the party who had put up the obstruction in the street.

The position of the defendant in the present case is substantially that because he had entered into a contract of insurance with an insurance company by which he was to be indemnified to a certain amount in case of fire, the company reserving the right at its own option of repairing or rebuilding the property, he was relieved from the obligation as the owner of the property of keeping constantly advised as to its condition and situation as connected with the safety of his neighbors or of the public.

This is a general primary obligation imposed on him by law of which he can not divest himself by a contract with others, by which they and not he are to decide and determine the extent and character of his obligations.   The contract between himself and those parties may serve as the criterion and measure of rights and obligations between themselves, but does not measure the rights of third persons and determine his liabilities to them.   It was defendant's duty, both before the fire and after the fire, to see that his building was in a safe condition.   It was specially his duty to examine the

building after the fire, to see how that occurrence had affected its situation. If at any given moment a building is unsafe, it is a matter of no moment to the general public whether the danger from it is occasioned by fire, by water, old age, or improper construction. Defendant in his testimony says the insurance company took charge of the property immediately without saying anything to him; he did not undertake to repair the building—he did not undertake anything at all; he turned over the property to the company for the purpose of repairing and reconstructing what was necessary; he had nothing to do with the repairs; he held the insurance company responsible; he told them so; he wanted them to make him whole; he never gave any order or direction to anybody employed; he never assumed any control of the work; he told the foreman (Moore) he had nothing to say in regard to the matter; he did not care about hearing anything of it.

Now it is precisely this indifference to the situation and failure to give any orders or direction in regard to the building—this unwillingness to hear anything about the condition of affairs which has given rise to defendant's present position. He very erroneously believed that the fact that he had taken out a policy of insurance with the Home Insurance Company, and that that company would make repairs, relieved him of all liability in the matter—that he had nothing to say in regard to the matter, and could safely wash his hands of the whole affair. Counsel say that by no rational construction could Alter be made responsible for the builder's want of judgment. We are of the opinion that the error of judgment (if such it was), as to the extent of what was necessary to be done to place the building in safe condition, must be held to be Alter's error of judgment—he had no right, as far as the public was concerned, to transfer to others the duty of determining what should be done for purposes of safety. The company had interests of its own adverse to the owner—it was interested in making the repairs as light as possible, at as small an expense as possible, while the rights of the public exacted that the repairs should be made as full and complete as security to others required. Defendant chose to permit the company and its employees not only to do certain work, but to decide and determine that certain other work need not be done. In adopting the last decision Alter made it his own. The situation is no wise affected by the fact that there was a contract between the insurance com-

pany and Alter. If Alter had in direct terms requested the company to send a man to the building to see what repairs were needed for purposes of safety, and it had sent its builder, Walther, for that purpose, who reported that everything was safe, when, in point of fact, it was not, unquestionably Alter could not shelter himself behind the erroneous report of the builder. (Howe vs. New Orleans, 12 An. 482.) This is practically what has happened in this case, the case supposed differing only in degree.

. In Gallagher vs. Southwestern Exposition Association, 28 An. 944 (cited by defendant), the court refers to the fact that the *whole* work had been confided to a contractor. We do not think that expression was accidental, but had in view cases where less work was contracted for than the necessities of the situation demanded for safety. We are of the opinion that the judgment appealed from, decreeing the defendant Alter legally responsible to plaintiff for the personal injuries which she received as set forth in his petition, is correct. The extent of his responsibility is a different matter.

Before the case went to trial the plaintiff was interdicted by reason of insanity, and her curator was made party as plaintiff. During the trial testimony was permitted (over defendant's objections) to be introduced to show the insanity of the plaintiff, its character as to probable duration and its cause. Defendant objected that evidence was not admissible under the pleadings, plaintiff having filed no amended nor supplemental petition setting up the facts which were sought to be proved. During the trial (and over defendant's objection), the judge, the jury and the clerk proceeded to the Louisiana Retreat (an institution for the care and custody of insane persons), situated in New Orleans, "for the purpose (so the minutes say) of viewing the plaintiff, and for the purpose of taking the testimony of the Sister in charge." The record shows that the plaintiff was brought in and examined at the Retreat, and the testimony of several of the "Sisters" of the institution was there taken. Defendant complains greatly of this proceeding as one intended solely to rouse the sympathy of the jury. He argues that the large amount granted to the plaintiff was greatly due to this visit to the Retreat.

The evidence in this case establishes beyond question the physical injuries received by the plaintiff, and traces them to the falling of the wall of No. 30 South Peters street. We think the sufferings

which she underwent were undoubtedly very great. We think, independently of any question of insanity, that her ability to provide for her own support and comfort was permanently affected and lessened, if not entirely cut off. We do not think that plaintiff's insanity has been established as having been the result of injuries received by her at the time of the falling of the wall, with the certainty which the law requires.

. It may be that the facts are as plaintiff contends, but the period which intervened between the accident and the insanity was too long, and the existence of producing causes prior to the accident too possible to justify us in considering plaintiff's position on this point legally established. The fact that none of plaintiff's family were placed upon the stand to controvert the theory of plaintiff having been at one time struck on the head by a flat-iron is an unfavorable circumstance. It is true that that theory rests upon the slightest of foundations—the statement of the insane person herself since her insanity to her attending surgeon, but as he stated in his testimony such declarations, even coming from an insane person, are frequently true. We think that the antecedent condition of plaintiff as to her mental condition should have been gone into by the plaintiff as part of the proof, and that in so doing it would have been very easy to have negatived the existence at any time of such a blow on the head as was stated. We must throw out of consideration, in determining this case, the insanity of the plaintiff. We are of the opinion that the jury did otherwise, and based its verdict to a considerable extent upon that fact.

We would have been forced to reduce the verdict, independently of any consideration of the visit of the judge and jury to the Louisiana Retreat, and of the testimony there taken, but we think it right, however, to say that that visit should not have been made, nor that testimony taken. The physical condition of the plaintiff had been fully proven—it really was not an issue in the case—the fact of her insanity was a conceded fact, and was, besides, established by judgment. The only thing which the jury could " view " through the visit was the fact itself of a depression in the head spoken of by the witnesses, which had been fully testified to. The jury were not experts, and would be no further advanced in their deliberations by seeing this depression than they would be by following the testimony of the experts, which had been taken before them. We agree with

24

the defendant that the visit to the Retreat had no good legal reason. to be based upon, and that its only effect would be to prejudice the· jury against the defendant and cause them to swell the damages. We think a judgment for the sum of four thousand dollars would ·fully meet the ends of justice and of law.

It is therefore ordered, adjudged and decreed that the judgment· appealed from be amended by reducing the amount for which judg- ment is rendered in favor of plaintiff against defendant from sixty- five hundred dollars to four thousand dollars, and, as so amended,. that it be affirmed.·